**Alvin D. MAYBERRY, Plaintiff,**

v.

**AKRON RUBBER MACHINERY CORPORATION, a corporation, and Uniroyal, Inc., a corporation, Defendants.**

**No. 79–C–34–BT.**

United States District Court,
N. D. Oklahoma.

Dec. 20, 1979.

---

408

Frank R. Hickman, Robert W. Booth & Associates, Tulsa, Okl., for plaintiff.

Dan A. Rogers, Rogers, Rogers & Jones, Tulsa, Okl., for defendant, Akron Rubber Machinery Corp.

Bert M. Jones, Rhodes, Hieronymus, Holloway & Wilson, Tulsa, Okl., for defendant, Uniroyal, Inc.

## MEMORANDUM OPINION

BRETT, District Judge.

The offending mechanism injuring the plaintiff in March 1974 is a large rubber mixing mill giving rise to this alleged manufacturer's product liability claim. Plaintiff was employed by Crest, Inc. (Crest) when he was injured in this industrial accident. Plaintiff's hand was crushed when it was caught between the rollers of the rub-

ber mixing mill he was operating and he sustained burns on his abdomen when he was pulled against the hot rollers of the machine.[1] The place of the accident, diversity of citizenship, and the amount of the plaintiff's claim provide proper venue and jurisdiction. References to the record are made to assist those having access to the record.

The plaintiff had been employed by Crest for one year at the time of the accident and had been an operator of the rubber mixing mills for approximately 6 months.[2] He had been supplied instruction and warnings concerning the mills by his employer, Crest, and was aware of the dangers in the machine.[3] He had knowledge of the fact that one of the Crest employees had lost his arm in a rubber mixing mill prior to plaintiff's employment.[4]

The mill in question was placed on the floor below a "mixer", the "mixer" being on the floor above. The rubber was dropped through a chute from the "mixer" into the center of the rollers where it passed between the rollers. The rubber would bond to one of the rollers. The rollers rotate slowly in opposite directions at different speeds to create friction causing additional mixing of the rubber. The operator of the mill (plaintiff) cut slabs of rubber off the rollers with a special knife.

On the date of the accident plaintiff reported to work at midnight. He usually had a helper but not this night. After working for two or three hours the mill "started messing up." He stopped the mill and reported to his superior, who told him to go back down and "cut off what" he "could" until a man came to fix it. Plaintiff returned to the mill to cut the rubber that was already on the rollers and then planned to stop the machine. Plaintiff testified that when the mill got too hot the rubber would start dropping or falling off the rollers and he would have to grab the rubber in order to put it back through the rollers so it would mix. He was holding and folding the rubber to throw it back on the rollers when additional rubber was released from the "mixer" chute above. The weight of the additional rubber coming down caused his right hand to become caught between the rollers. Plaintiff testified that if the rubber mix had not been released from the "mixer", the accident would not have occurred. When plaintiff's right hand became enmeshed in the mill rollers, he hit the safety cable above the rollers with his free left hand, thus stopping the mechanism and permitting him to free his injured hand.[5]

The defendant, Uniroyal, Inc., (Uniroyal) acquired rubber mixing mill machines when it purchased a plant from Fisk, Inc., in 1939. These rubber mixing mill machines were manufactured by an unknown company around 1917.[6]

In 1970 Uniroyal advertised in industry publications that it had for sale certain obsolete mill parts and equipment. Following up on the offer, Mr. Robert C. Gray, a plant engineer for Crest, and a team of Crest workmen, went to Uniroyal's plant and dismantled the mill, removed the rollers and shipped them to Tulsa. These roller components were incorporated into the Crest designed mill and were involved in the plaintiff's injury.[7]

The vertical frames or stanchion components of the Crest designed and constructed mill were also obsolete parts purchased

1. The parties have agreed that discovery elicited in a prior case (# 76–C–99) between these parties [which case was dismissed by plaintiff] is to be used in the instant litigation.

2. Mayberry deposition, Pages 8–10; Page 15, Lines 13–16.

3. Mayberry deposition, Page 50, Lines 13–17; Page 51, Lines 5–13; Page 68, Line 25; Page 69, Lines 1–6.

4. Mayberry deposition, Page 19, Lines 10–17.

5. Mayberry deposition, Pages 22–23.

6. Uniroyal, Inc. Answers to Plaintiff's Interrogatory Number 6 (November 12, 1976, Case # 76–C–99).

7. Gray deposition, Page 14, Lines 5–10.

from the defendant, Akron Rubber Machinery Corporation (Akron).[8]

The other various component parts of the rubber mixing mill, including the H-beam upon which the frames were placed, electrical switches, motor and drive mechanism were obtained piecemeal from various other suppliers as well as from materials on hand at the Crest plant.[9]

The significant measurements of the mill are as follows: A photograph of the mill reveals that the entire unit appears to be approximately 6 feet high and 12 feet wide.[10] The front roller on the mill has a diameter of 16.9 inches. The back roller on the mill has a diameter of 20.7 inches. The rollers are generally 5 to 6 feet in length. The distance from the floor to the center line of the rollers is 51 and ½ inches. The distance from the floor to the safety cable is 71 inches. The mill rests on a base (H-beam) in excess of one foot in height from the floor.[11]

Mr. Gray, the plant engineer, worked for Crest for a period of some eight and one-half years. Before his employment at Crest, he had worked for several rubber companies. He had designed and constructed about a dozen rubber mills, the first being 25 years previous.[12]

In March of 1974, there were seven rubber mills at the Crest plant.[13] Mr. Gray, on behalf of Crest, designed and constructed the rubber mill involved by measuring the parts with which he had to work with and making a drawing to aid the workers in constructing the machine.[14] Mr. Gray designed the hand activated cable safety device above the rollers used to stop the mill in an emergency situation.[15] The mill which was dismantled by Mr. Gray at the Uniroyal plant had a drive shaft but the mill later designed and constructed by Mr. Gray, using the Uniroyal rollers, had no drive shaft.[16]

The defendants, Uniroyal and Akron, did not give any warnings with reference to the rollers or frames and did not furnish Crest designs, blue prints, or literature for the construction of the Crest rubber mixing mill. No representatives of the defendants visited Crest for the purpose of consultation or inspection while the Crest mill was being designed, constructed, or placed in use.[17]

It is the contention of the plaintiff that the frames supplied by Akron were defective because they were improperly designed as to height, being too low. The rollers supplied by Uniroyal were allegedly defective and therefore unreasonably dangerous because of the lack of any primary or secondary safety device. Plaintiff further contends a failure to warn of the inherent dangers of these components on the part of both defendants.[18]

The parties agree the rubber mixing mill involved, with the used components (the rollers and frames) supplied by the defendants Uniroyal and Akron, was actually de-

8. Akron Answers to Plaintiff's Interrogatory # 6 (October 13, 1976, in Case # 76–C–99).

9. Gray deposition, Page 30, Lines 4–8; Page 41, Lines 11–25; Page 42, Lines 3–4; Page 51, Lines 8–11.

10. A photograph of the rubber mixing mill is attached.

11. Exhibit "1" of plaintiff introduced into evidence at the hearing on Motions for Summary Judgment.

12. Gray deposition, Pages 4–5.

13. Gray deposition, Page 7, Line 5.

14. Gray deposition, Page 13, Lines 15–17.

15. Gray deposition, Page 25, Lines 10–16.

16. Gray deposition, Page 24, Lines 19–25; Page 25, Lines 1–4.

17. Akron Answers to Plaintiff's Interrogatories 1, 2, 3, 10, 11, 12 (October 13, 1976, Case # 76–C–99); Uniroyal Answers to Plaintiff's Interrogatories 1, 2, 3, 10, 11, 12, 13 (November 12, 1976, Case # 76–C–99).

18. Transcript of hearing on Motion for Summary Judgment, Page 14, Lines 19–23; Page 16, Lines 14–22; Page 17, Lines 6–11; Page 23, Lines 8–25; Page 24, Lines 1–7; Page 26, Lines 17–23.

signed and constructed by the plaintiff's employer, Crest.[19]

Plaintiff's expert witness [20] concluded the mechanism's secondary safety device (emergency safety cable) as designed and installed was inadequate because it should have been more accessible to the operator for timely activation. Further, he found that the Crest mill was designed in such a way that it had a base step-up in excess of one foot in height which allowed the operator to stand on the elevated step,[21] thereby increasing the chance of operator injury because his hands were in closer proximity to the moving rollers.

Plaintiff's expert stated in connection with a primary safety device ("a device or spatial orientation") that "[O]ne way to accomplish this [safeguard] is to ensure a sufficient distance between the floor level and the top of the rollers. If a distance in excess of sixty-five (65) inches is used, the possibility of an operator reaching into the danger area will be greatly reduced." He identified a "secondary safety device" as the overhead line or cable which was pressured operated to stop the rollers.

The evidence of defect relates only to the improper Crest design for its failure to include proper primary and secondary safety features. There is no evidence the used components, the rollers or vertical frames were themselves defective.

Both defendants have moved for a summary judgment which the Court finds should be sustained. A summary judgment is proper upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R.Civ.P. All matters in the record and all reasonable inferences to be drawn therefrom must be construed liberally in favor of the party opposing the motion. *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442 (10th Cir. 1976); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir. 1975).

In *Ando v. Great Western Sugar Co.*, 475 F.2d 531, 535 (10th Cir. 1973), the Court said:

> "[T]he trial court may pierce the pleadings by determining from the depositional proof, admissions and affidavits in the record whether any material issues of fact exist. * * * "

The doctrine of strict liability or manufacturer's product liability, as set forth in section 402A of the Restatement of Torts (Second) has been adopted as the law in Oklahoma.[22] *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okl.1974).

---

**19.** Commencing at page 15, line 16 and continuing to page 16, line 12, the following statements were made at the hearing on the Motions for Summary Judgment.

"THE COURT: All right, but taking a look at what is designated here, the black and white 8-by-10 which is designated here in the file as Photograph No. 1, it's my understanding what the record seems to indicate is that of that entire mechanism sitting there, the rollers were supplied or purchased from Uniroyal.
MR. HICKMAN *: That's my understanding.
THE COURT: Okay. That the vertical supports there were perhaps supplied by or purchased from Akron.
MR. HICKMAN: That's my understanding.
THE COURT: All right. It's my understanding that the record is quite clear that the entire contrivance here, or the rubber mixing mill, the entire mechanical unit as it sits there by the electrical parts and the drive shafts and whatever safety mechanisms were attached and the like, were a product designed by and put together by or under the supervision of Mr. Gray, an employee of the employer of the plaintiff. Is that true?
MR. HICKMAN: Crest.
THE COURT: Is that true as to how this thing was put together?
MR. HICKMAN: That's my understanding, too."
* Mr. Hickman is counsel for the plaintiff.

**20.** Reporting of Testing Consultants, Inc., dated March 5, 1975, signed by Mr. Toby S. Nelson, Chief Engineer, introduced as Plaintiff's Exhibit "1" at hearing on Motion for Summary Judgment.

**21.** Plaintiff testified in his deposition that *he was standing on the floor and not on the "base step" at the time of the accident.* Mayberry deposition, Page 29, Lines 18–25; Page 30, Lines 1–4.

**22.** § 402A. *Special Liability of Seller of Product for Physical Harm to User or Consumer.*

412

■ At least three types of unreasonably dangerous defects may exist under Section 402A. A product may be defective because of manufacturing or supplier flaws, defective design, or failure to supply proper warning about the product's dangers. *Burton v. L. O. Smith Foundry Products Co.*, 529 F.2d 108 (7th Cir. 1976).

■ By its very terms, Section 402A imposes strict liability only where the defective product reaches "the user or consumer without substantial change in the condition in which it is sold."

With regard to "defective condition" Comment "g" to § 402A Restatement of Torts 2d at 351, states:

"The rule in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him."

■ With regard to "unreasonably dangerous" Comment "i" says, Ibid., at 352:

"The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common in the community as to its characteristics."

Whether concern is with one or both of the requirements, there is "general" agreement that to prove liability under § 402A the plaintiff must show that the product was dangerous beyond the expectation of the ordinary customer. *Bruce v. Martin-Marietta Corp., supra,* at 447.

In an attendant "comment 1" to § 402A, it is explained that "user" includes an employee of the purchaser. Moreover, the black letter text of Section 402A is followed

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

by a "caveat" that no opinion is expressed whether the doctrine of that section should apply to "the seller of a product expected to be substantially changed before it reaches the user." *Hanlon v. Cyril Bath Co.*, 541 F.2d 343, 345 (3rd Cir. 1975)

*CLAIMS ASSERTED AGAINST UNIROYAL, INC.*

(a) *Defective design occasioned by lack of adequate safety devices.*

■ Initially, the Court must determine, from the undisputed evidence, the responsibility for a safety device by looking primarily to three factors. *Verge v. Ford Motor Co.*, 581 F.2d 384, 387 (3rd Cir. 1978).

First is trade custom—at what stage is that device generally installed.

Second is relative expertise—which party is best acquainted with the design problems and safety techniques in question.

Third is practicality—at what stage is installation of a device most feasible.

From the undisputed evidence before the Court it is apparent that plaintiff's claim must fail.

The Court concludes that under the "three-pronged" test above delineated Uniroyal was not responsible as a matter of law for the adequacy or lack of safety devices on the subject mill machine.

Of critical importance are the following undisputed facts:

(i) The rollers were not manufactured by Uniroyal.

(ii) The equipment from which the rollers were "canabalized" was offered for sale as obsolete equipment.

(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

(iii) Employees of Crest dismantled the Uniroyal equipment and selected and shipped to Crest those parts they determined Crest needed.

(iv) The rubber mixing mill was designed and constructed by employees of Crest.

(v) Uniroyal supplied only the rollers for the Crest mill machine and Uniroyal did not assemble the parts it did supply.

(vi) Uniroyal was not furnished plans of the Crest machine and was never contacted by Crest for the submission of any plans or directions for the design and construction of the Crest mill into which the rollers were placed.

The Court further finds that Crest was knowledgeable in the rubber industry and in the construction of rubber mixing mills. It is further apparent that Crest, plaintiff's employer, was aware of the inherent dangers in a rubber mixing mill and the need of adequate safety devices.

■ The Court concludes that at most Uniroyal was a supplier of used component parts and as such, under the uncontroverted facts as they exist in this case, was not responsible for the ultimate design and construction of the mill and the safety devices for the Crest mill. To impose strict liability upon Uniroyal in this case for a defective design would carry the law beyond the provisions of § 402A as approved by the American Law Institute and subsequently adopted by the Oklahoma Supreme Court.

■■ Where a supplier furnishes a component part free of defects and without knowledge of the design of the end product, strict liability should not be imposed on the supplier for injury resulting from the end product design. For example, strict liability should not extend to the manufacturer or supplier of a rotary saw blade free of defects when it is determined a subsequent manufacturer of the rotary table saw failed to incorporate a common safety guard in its exclusive design.

In the instant case, plaintiff admits no defect in the rollers standing alone, but asserts that the defect was the failure to supply adequate safety devices in reference to the operation of the rollers.

(b) *Duty to warn.*

■ There is ordinarily no duty to give a warning to members of a profession against dangers generally known to members of that profession. *Lockett v. General Electric Company*, 376 F.Supp. 1201, 1209 (USDC ED Pa.1974). (The Court is aware that the case involved §§ 388–389 of the Restatement and not § 402A).

This Court has not been presented with any decision which would require the supplier of used component parts which are not defective to warn the subsequent product manufacturer and his employees of any danger which might arise after the components are assembled according to the manufacturer's exclusive design.

■ A duty to warn exists only when those to whom the warning is to be communicated can reasonably be assumed to be ignorant of the dangers to which the warning relates. If it is unreasonable to assume they are ignorant of those facts, there is no duty to warn. *Burton v. L. O. Smith Foundry Products Co., supra,* at 111. In other words, where the danger or potentiality of danger is known or should be known to the user, the duty [to warn] does not attach. *Berry v. Porsche Audi, Inc.*, 578 P.2d 1195 (Okl.1978); *Nicholson v. Tacker*, 512 P.2d 156 (Okl.1973); *Davis v. Fox River Tractor Co.*, 518 F.2d 481 (10th CCA 1975); *Marshall v. Ford Motor Co.*, 446 F.2d 712 (10th CCA 1971); *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th CCA 1968); *Lambertson v. Cincinnati Corp.*, 257 N.W.2d 679 (Minn.1977); *Doran v. Pullman Standard Car Mfg. Co.*, 45 Ill.App.3d 981, 4 Ill.Dec. 504, 360 N.E.2d 440 (Ill.1977); and *Dixon v. Outboard Marine Corp.*, 481 P.2d 151 (Okl. 1971).

■ Here the record substantiates that as a matter of law there is no duty on the part of Uniroyal, as the supplier of used

component parts, to warn the purchaser-manufacturer Crest of the dangers inherent in rubber mill rollers.

## CLAIMS ASSERTED AGAINST AKRON RUBBER MACHINERY COMPANY.

(a) *Defective design of the frames (height).*

As heretofore noted, the base step in excess of one foot in height which allowed the operator to stand on the elevated step consisted of an "H-beam" secured by Crest from a supplier in Tulsa to be used in Crest's overall machine design. The expert witness stated in his report: "[T]he mill has a base step up in excess of one foot in height . . . This allows the operator to stand on the elevated step-up which significantly increases the chance of having his hand caught between the rollers. This elevated base is both unnecessary and a safety hazard." The evidence is that plaintiff was not standing on the base step when the accident occurred but on the floor. The use of the base step and the height of the rollers in relation to the frames is a function of the Crest design in which Akron took no part.

Plaintiff has presented no evidence as to the height of the frames themselves being defective. His complaint and the evidence adduced can only be considered conclusions on the part of the plaintiff and not substantive evidence the frames were defective because of their height.

The above reasoning under the section pertaining to the claims against Uniroyal—"(a) Defective design occasioned by lack of adequate safety devices"—is equally applicable to Akron.

In "caveat p" to the Restatement it is noted that in the absence of decision providing a clue to the rules which are likely to be developed, the Institute took no position as to the possible liability of the seller where the product is expected to, and does, undergo further processing or other substantial change after it leaves the seller's hands and before it reaches those of the ultimate user or consumer. In "caveat q" the Institute notes that the same situation presents itself in cases of the sale of a component part of a product to be assembled by another.

The Court concludes, based on the uncontroverted evidence before it, that the defect relied on by the plaintiff as evidenced by his expert's report is the failure of Crest to incorporate adequate primary and secondary safety features in its machine design. This is properly the subject of expert testimony. *Randolph v. Collectramatic*, 590 F.2d 844 (10th CCA 1979).

(b) *Duty to warn.*

The Court finds that the rationale applicable to Uniroyal hereinabove set forth applies equally to the duty to warn of the defendant Akron.

Accordingly, the Court concludes that the uncontroverted evidence, when viewed in a light most favorable to the plaintiff, requires that the Motions for Summary Judgment of Uniroyal and Akron be sustained and judgment entered in favor of said defendants.

Appendix to follow.