EUGENE SUICH, Plaintiff-Appellee, v. H & B PRINTING MACHINERY, INC., Defendant-Appellant and Third–Party Plaintiff-Appellee (Carrier Corporation, Third–Party Defendant-Appellant).

First District (2nd Division)   No. 1—88—0521

Opinion filed June 27, 1989.—Rehearing denied August 15, 1989.

Sweeney & Riman, Ltd., of Chicago (Marvin Riman, Edward McGinnis, and Georgene Wilson, of counsel), for appellant Carrier Corporation.

Demos & Burke, of Chicago (William Burke and Linda Leonetti, of counsel), for appellee Eugene Suich.

Mountcastle & DaRosa and Lloyd Dyer, both of Wheaton (David Mountcastle and John Kelly, of counsel), for H & B Printing Machinery, Inc.

JUSTICE HARTMAN delivered the opinion of the court:

A products liability action brought by plaintiff Eugene Suich against the manufacturer of a gantry crane, H & B Printing Machinery, Inc. (H & B), and H & B's third-party contribution action alleging negligence against plaintiff's employer, Carrier Corp. (Carrier), were tried together before the same jury, resulting in a verdict in plaintiff's favor for $2,800,707, and for H & B on its contribution claim, allocating fault as 20% to H & B and 80% to Carrier. Both H & B and Carrier appeal.

On appeal, H & B questions whether the circuit court erroneously struck portions of H & B's assumption of risk and misuse affirmative defenses and erred in denying H & B's motions for judgment *n.o.v.* or for a new trial.

Carrier identifies error in the court having: denied Carrier's motion for a directed verdict; allowed plaintiff's cross-examination of H & B's expert in excess of the scope of direct examination; allowed H & B to transfer its nondelegable duty to manufacture a reasonably safe product to Carrier; restricted Carrier in its cross-examination of plaintiff's economic expert; issued misleading instructions to the jury; and permitted the verdict against Carrier to stand although contrary to the manifest weight of the evidence.

On January 22, 1982, plaintiff and co-worker Craig Richardson, employees of Carrier, in servicing a Carrier air conditioning unit, were using a portable gantry crane designed and manufactured by H & B and rented to Carrier. A 3,000-pound part called a discharge volute was being removed from an air conditioning unit and, during this operation, the gantry tipped over or collapsed, and dropped the discharge volute on plaintiff's legs.

The H & B portable overhead gantry consists of an I-beam supported by and resting on two upright columns composed of an outer pipe (base pipe) and an inner pipe (telescoping tube), which fits into the base pipe. The telescoping tube can be raised or lowered on each side to set the I-beam at the desired height, to a maximum of 10 feet. Each base pipe is attached to a rectangular base equipped with four casters. Floor locks, which prevent the casters from moving the gantry, are optional equipment. The gantry involved in this accident was not so equipped. A trolley is attached to the I-beam, and a block and tackle chain hoist is then suspended from the trolley. Once a load is lifted by the hoist, it can be moved by rolling the trolley along the beam. The portable gantry can be disassembled and reassembled at the particular site where needed.

Keeping the frame bases at 90-degree (perpendicular) angles to

the I-beam in lifting a load gives the gantry the greatest amount of stability. Rotation of the bases away from a perpendicular angle decreases the stability of the gantry when used to lift heavy objects. The gantry is least stable when these bases are rotated lengthwise and parallel with the I-beam.

Prior to 1979, the design of the H & B gantry only provided for the upper telescoping tubes to have holes drilled in them for placement of height adjustment pins; when the beam was raised to the desired height, a pin was inserted into the hole (one on each side). The pin rested on the top of the base pipe and maintained the beam at the raised height. This design allowed the base pipe and connected frame to be rotated away from an angle perpendicular to the I-beam.

In 1979, as a safety measure, H & B designed the gantry so as to have a set of holes added to the top portion of the base pipe, allowing the pin to be inserted through both the outer base pipe and the inner telescoping tube, effectively locking them together and preventing the bases from being rotated. The instructions accompanying the gantry stated: "Pins should be put through outer holes and through inner tube holes to keep the unit level." The instruction sheet did not warn the gantry user of the danger of tipping if the bases were rotated.

Plaintiff began working for Carrier in 1953 and joined its pipe fitter apprenticeship program four years later. In this apprenticeship, he worked four days each week with Carrier servicemen and one day per week attending classes at Washburne Trade School. The only education plaintiff ever received regarding use of gantries came during on-the-job instruction form Carrier's journeyman pipe fitters. Carrier did not train its service personnel, such as Suich, in the proper use of gantries, relying on journeymen to pass along that information. Suich eventually became a journeyman pipe fitter after the five-year apprenticeship program.

On the date of the injury, plaintiff was servicing a Carrier model 19C commercial air conditioning unit located at Talman Home Federal Savings & Loan in Chicago. He had serviced this unit on prior occasions. Working with Craig Richardson, plaintiff was in the process of dismantling and reassembling the machine in order to effect repairs. The men were using a rented H & B gantry with a 12-foot beam, and had been removing various pieces of the compressor successfully and without incident for several days.

Immediately prior to the accident, the men began removing a 3,000-pound piece called a discharge volute. The gantry had been set up with one leg behind the compressor, its base perpendicular to the beam, and the other leg in front, its base rotated slightly to align the

beam directly over the center of the compressor. A concrete pad on the floor prevented proper alignment with both bases of the gantry perpendicular to the I-beam. This gantry setup was identical to one used successfully five years earlier on the same unit.

Plaintiff, the lead man on the job, decided not to use a 15-foot I-beam, because the weight of the piece to be removed exceeded the capacity of the longer beam. Also, he did not use a tool called a rigging pedestal (also referred to as a "short leg" or "stiff leg"). This rigging pedestal, developed by Carrier and manufactured for Carrier by H & B, essentially substituted for one leg of the gantry. It would be bolted onto the top of the compressor, eliminating the need for the gantry to span the entire length of the unit; this allowed a shorter I-beam to be used when lifting interior pieces. The rigging pedestal, not devised for safety according to the former Carrier engineer who designed it, but to avoid damage to compressor parts, could be used effectively with the 19C unit. A letter, explaining the design and use of the rigging pedestal, was sent to regional service engineers employed by Carrier, but was not distributed to the mechanics who would be using this tool. Instructions as to how the tool was to be assembled were given to the mechanics, but not as to when the device should or should not be used from the standpoint of safety. A training film produced by Carrier's employees, which included some instructions on the safe use of gantries, was not shown to Carrier's mechanics such as Suich, nor was a safety workbook containing the same instructions.

Using the gantry, the men affixed two hoists to the trolley and attached them to the volute. After disconnecting some bolts, they pushed the volute off of a shaft in the compressor, sliding the load about 18 inches along the trolley, without problem. They intended to lower the volute to the floor, secure it with wood blocks, and clean it. As the volute was lowered, Richardson saw the I-beam start to bend. The volute fell over, pinning plaintiff to the floor and crushing his legs. Richardson used a floor jack to lift the volute, and pulled plaintiff out from underneath. Plaintiff was taken to the hospital; his right foot was "filleted and crushed and split apart," and his left foot was also fractured and seriously injured.

Plaintiff has had four surgeries since the accident, including three attempted fusions of the right ankle, none of which have been successful. Two doctors also testified that if the persistent pain becomes intolerable, the only remaining alternative is a below-the-knee amputation.

Plaintiff filed a complaint alleging products liability against H & B, contending that the gantry was unreasonably dangerous: in that the

legs of the gantry could be rotated in positions that were not perpendicular to the beam; it failed to warn users regarding the danger of using the gantry with the legs rotated; and the casters on the gantry supplied to Carrier could not be locked in a fixed position. In response, H & B asserted the affirmative defenses of misuse and assumption of risk. H & B filed a third-party complaint for contribution against Carrier, alleging negligent training, instruction, and supervision of plaintiff. Before trial, plaintiff's motion for summary judgment on H & B's misuse defense was granted.

After plaintiff rested his case, H & B's motion for a directed verdict was denied. After H & B rested its case, Carrier's motion for a directed verdict also was denied. The jury then returned a verdict for plaintiff in the amount of $2,800,707. The jury further determined that there was no assumption of risk by plaintiff, and apportioned 20% of the damages to H & B and 80% to Carrier. After their posttrial motions were denied, H & B and Carrier both appealed.

I

Defendant H & B initially asserts on appeal that the circuit court erred in striking portions of its assumption of risk and misuse affirmative defenses. The circuit court permitted H & B to raise the affirmative defense of assumption of risk with respect to plaintiff's conduct in removing the height-adjustment pins on the gantry legs and in rotating the gantry's bases, but struck three other paragraphs that alleged plaintiff assumed the risk by failing to use the rigging pedestal, by using a 12-foot I-beam rather than the longer 15-foot beam, and by using two chain hoists on one trolley.

■■ Assumption of risk, an affirmative defense to a products liability action (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305), operates to reduce plaintiff's recovery by that amount which the jury finds him to have been at fault. (*Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 119, 454 N.E.2d 197.) The assumption of risk test is fundamentally subjective "in the sense that it is his knowledge, understanding and appreciation of the danger which must be assessed, rather than that of the reasonably prudent person" (*King v. American Food Equipment Co.* (1987), 160 Ill. App. 3d 898, 908, 513 N.E.2d 958, *appeal denied* (1987), 117 Ill. 2d 544), and applies only if the user "is actually aware of the defective nature of the product and appreciates its unreasonably dangerous character, but chooses voluntarily to act in disregard" of the known danger (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 213, 407 N.E.2d 32). To determine the propriety of the circuit court's

action in striking portions of H & B's affirmative defense of assumption of risk, the totality of the evidence in its aspect most favorable to H & B must be considered. *Williams*, 45 Ill. 2d at 431, citing *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Essentially, H & B argues that plaintiff proceeded to use the gantry with rotated bases, while actually aware of the danger resulting from such rotation; his voluntary use of the gantry without the rigging pedestal therefore was unreasonable and constituted an assumption of risk. No record evidence discloses that use of the rigging pedestal would make it unnecessary to rotate the bases. A Carrier supervisor stated only that one use of a rigging pedestal is to add stability to the gantry. Plaintiff did not know whether use of the rigging pedestal would have enabled him to keep the bases perpendicular to the I-beam (unrotated) on the Talman 19C job; another Carrier mechanic averred that even with the short leg, he needed to rotate the base on the gantry slightly at the Talman 19C job. Plaintiff thought the gantry was reasonably safe, even with the bases rotated, since he had repaired the same unit before using identical procedures. At most, plaintiff's failure to use the rigging pedestal on the Talman 19C unit might have been considered contributory negligence, which would not reduce his recovery in a products liability action in Illinois. See *Coney*, 97 Ill. 2d 104, 454 N.E.2d 197.

H & B also suggests that the rigging pedestal was specifically designed for safety; however, Charlie Miller, the designer of the rigging pedestal, stated that the main purpose in designing the tool was to avoid damage to the air-conditioner parts during servicing. The circuit court's ruling on this issue was correct for an additional reason: the rigging pedestal was not a part of the H & B gantry. Rather, it was an additional tool designed by Carrier and manufactured for it by H & B that could be used in conjunction with the gantry. The focus of this case was on the design of the gantry itself; evidence of other products, such as the rigging pedestal, which could offset the defective design of the gantry, is irrelevant. *Thomas v. Kaiser Agricultural Chemicals*, 81 Ill. 2d at 217.

■ The circuit court did not err in striking the affirmative defense relating to plaintiff's failure to use a longer I-beam. All the evidence indicated that the use of a 15-foot I-beam was insufficient to support the weight of the discharge volute to be lifted. In fact, H & B's vice-president and manager, Phillip J. Bracht, stated that as the length of the beam used is increased, its load-carrying capacity is reduced, a conclusion concurred in by other witnesses. Plaintiff's failure to use the longer beam was not an assumption of risk.

Nor did the circuit court err in striking H & B's assumption of risk affirmative defense relating to plaintiff's use of two chain hoists on one trolley. There was no evidence that plaintiff knew of any danger in using two hoists on one trolley; to the contrary, another Carrier employee testified that it was common practice to do so on a 19C repair. Also, plaintiff's actions, even if deemed improper, cannot constitute assumption of risk of a defective product under the circumstances presented here, because the use of two hoists on one trolley in no way relates to the dangerous condition of the gantry alleged by plaintiff, namely, the ability to lift a load with the bases rotated.

At the end of the trial, H & B sought leave to amend its answer to include an affirmative defense of misuse, based on testimony relating to plaintiff's use of the two chain hoists on a single trolley. That motion was denied by the court. On appeal, H & B contends that the question of misuse should have been presented to the jury.

■ Misuse is the utilization of a product "for a purpose neither intended nor 'foreseeable' [objectively reasonable] by the defendant" (*Williams*, 45 Ill. 2d at 425; *King v. American Food Equipment Co.*, 160 Ill. App. 3d at 909) and, like assumption of risk, operates to reduce plaintiff's recovery by the amount of fault apportioned to him by a jury. (*Coney*, 97 Ill. 2d at 119.) This question of foreseeability normally is one for the jury, and the standard applicable to the circuit court's striking of the affirmative defense of misuse is, in viewing the evidence most favorably to defendant, whether it so overwhelmingly favors the plaintiff that no contrary verdict could ever stand on this issue. *King*, 160 Ill. App. 3d at 909.

H & B admits that the use of two hoists on a single trolley was foreseeable to it, which defeats the affirmative defense of misuse. Joseph Bracht, president of H & B, recalled rigging two trollies with a bridge between them when Carrier previously needed to use two hoists. Phillip Bracht testified that a tool known as a "spreader bar" could be used when a worker needed to suspend two hoists from one trolley, indicating his awareness that such use occurred. The availability of optional equipment which prevents misuse indicates the objective foreseeability of such misuse. See *Knapp v. Hertz Corp.* (1978), 59 Ill. App. 3d 241, 248, 375 N.E.2d 1349; see also *King*, 160 Ill. App. 3d at 909.

■ To prove misuse of its gantry, H & B was required to demonstrate that its product was used for a *purpose* neither intended nor foreseeable, rather than in a *manner* neither intended nor foreseeable. (*Dukes v. J.I. Case Co.* (1985), 137 Ill. App. 3d 562, 580, 483 N.E.2d 1345, *aff'd but consolidated case rev'd sub nom. J.I. Case Co.*

*v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 516 N.E.2d 260.) In the instant case, the gantry was being used to lift a heavy object, a purpose for which it was intended; the use of two chain hoists to raise the volute was the manner in which the gantry was used to accomplish the lift. Since the gantry was being used for its intended purpose, the allegation of misuse must fall.

## II

H & B next submits that the circuit court erred in denying its motions for a judgment notwithstanding the verdict and for a new trial because plaintiff failed to prove that an unreasonably dangerous product was the proximate cause of his injuries and the evidence does not support a finding that plaintiff did not assume the risk of injury.

■■ A judgment *n.o.v.* ought to have been entered here only if all the evidence, viewed in its aspect most favorable to plaintiff, so overwhelmingly favored H & B that no contrary verdict based on that evidence could ever stand. (*Pedrick*, 37 Ill. 2d at 510.) The verdict can be set aside and a new trial ordered only where it is contrary to the manifest weight of the evidence. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32.) A verdict is contrary to the manifest weight of the evidence "only when the opposite conclusion is clearly apparent or the findings appear to be unreasonable, arbitrary, and not based on the evidence." *Murray v. Kleen Leen, Inc.* (1976), 41 Ill. App. 3d 436, 441, 354 N.E.2d 415.

■■ Plaintiff here was required to prove that his injury resulted from a condition of the gantry and that the condition was unreasonably dangerous and existed at the time the gantry left H & B's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623, 210 N.E.2d 182.) Ample evidence existed to support the jury's finding that the gantry was unreasonably dangerous when it left H & B's control. Several witnesses, including H & B's president and vice-president, agreed that it was unsafe to operate the gantry with the bases rotated. Plaintiff's expert, Marvin Salzenstein, concluded the gantry was unreasonably dangerous because the bases could be rotated, the gantry lacked sufficient warning of the dangers of lifting with rotated bases, and the casters were not locking. Salzenstein also suggested several design features, of insignificant cost, that would prevent rotating the bases, and identified other manufacturers using such alternative designs. This evidence supports the jury's finding that the H & B gantry was unreasonably dangerous.

That the gantry is a multifunctional machine since it is used in a variety of jobs, as claimed by H & B, and therefore not unreasonably

dangerous merely because of the absence of various safety devices which might or might not be required for its safe operation, must be rejected since a gantry's sole purpose is to lift heavy objects. The fact that a variety of objects can be lifted does not make a gantry multifunctional. See *Medina v. Air-Mite Devices, Inc.* (1987), 161 Ill. App. 3d 502, 508, 515 N.E.2d 770.

Additionally, it was foreseeable to H & B that its gantry would be used with its bases rotated. Joseph Bracht testified that he knew for 20 or 30 years that people rotated the base of his gantries. He stated he knew it was a misuse of the gantry, but only issued verbal warnings to correct the situation.

The evidence also supports a finding by the jury that the unreasonably dangerous condition proximately caused plaintiff's injury. Salzenstein stated that, in his opinion, the cause of the gantry's collapse was the unstable condition that resulted from the rotation of the base, the failure of H & B to provide adequate warnings, and its failure to provide locking casters. Woodrow Nelson, H & B's expert, concluded that the cause of the accident was a "side pull" created when the volute made contact with the floor. It is for the trier of fact to weigh conflicting testimony since it sees and hears the witnesses, and observes their manner and demeanor. (*Hay v. Frate Service, Inc.* (1973), 14 Ill. App. 3d 561, 564, 302 N.E.2d 757.) The jury found proximate cause to exist. There is no basis upon which to overturn that finding.

The evidence also supported the jury's finding that plaintiff did not assume the risk of injury by his failure to use the locking height-adjustment pin and the subsequent use of the gantry with its bases rotated. Although plaintiff knew that the gantry was less stable with the bases rotated, and that the locking pin should be used to secure the base, his use of the gantry with one base rotated does not necessarily rise to the level of assumption of risk. The jury reasonably could have found that he was not actually aware of the defects or that he did not appreciate the unreasonably dangerous character of the gantry with rotated legs, based on the following evidence: he thought the gantry was reasonably safe with the bases rotated; he had no knowledge of a structural defect which would cause the gantry to fall over; he rotated the bases on previous jobs without any indication of a problem; and it was common practice among his co-workers to rotate the bases as necessary. Testimony by a plaintiff and his co-workers that they have been performing a task in the same manner for a number of years constitutes evidence that plaintiff did not appreciate the danger and assume the risk. (See *Doran v. Pullman Standard Car*

*Manufacturing Co.*(1977), 45 Ill. App. 3d 981, 991, 360 N.E.2d 440.) Plaintiff's admission that he knew the gantry became "less stable" does not mean he knew it was "unstable," dangerous, or unsafe. Plaintiff's evidence directly rebuts the interpretation offered by H & B.

The evidence, viewed most favorable to plaintiff, did not overwhelmingly favor H & B, and a judgment *n.o.v.* would have been improper. Further, the jury's findings against H & B were not contrary to the manifest weight of the evidence. The circuit court did not err in denying H & B's motions.

### III

Third-party defendant Carrier raises several issues on appeal. Initially, Carrier asserts that the circuit court erred in denying its motion for a directed verdict, contending that there was no competent evidence concerning its standard of care or demonstrating that its actions or inactions proximately caused plaintiff's injuries. A directed verdict would have been proper if the evidence, viewed in an aspect most favorable to H & B, so overwhelmingly favored Carrier that no contrary verdict based on the evidence could stand. *Pedrick*, 37 Ill. 2d at 510.

Carrier maintains that H & B's failure to elicit expert testimony to establish Carrier's negligence, or that such negligence proximately caused the accident, should have resulted in a directed verdict on its behalf. Carrier submits that the average juror would be incapable of understanding the kind of training, instruction, and supervision needed by its employees for the method of repair of commercial airconditioners. Without expert evidence, Carrier concludes the jury could only speculate as to its liability.

■ Testimony of an expert is permitted when: (1) his opinion is particularly related to a science, profession, business or occupation outside the common knowledge or experience of an average juror; (2) the opinion will aid the juror in the search for truth because the expert has sufficient skill, knowledge, or experience in that field; and (3) the state of the art or scientific knowledge allows the expert to assert a reasonable opinion. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 211, 398 N.E.2d 188.) No case discusses when the court must *require* expert testimony; those cases contemplating whether the court may *allow* experts to testify agree that the use of such testimony is within the discretion of the trial court. *Mattice v. Goodman* (1988), 173 Ill. App. 3d 236, 241, 527 N.E.2d 469.

■ This court declines Carrier's invitation to require expert testi-

mony to establish its standard of care or existence of proximate cause in the instant case. The authority cited by Carrier in its brief does not persuade otherwise. Cases involving medical malpractice (*St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 455 N.E.2d 294), the operation of a revolving door, and violations of building code provisions leading to injury (*Mattice*, 173 Ill. App. 3d 236) involve matters clearly outside the common knowledge or experience of the average juror. Furthermore, the explanatory testimony of Carrier employees sufficiently informed the jury in the use of the gantry and provided evidence of Carrier's obligation and the existence of proximate cause.

## IV

■■■ Should plaintiff have been allowed to elicit testimony from H & B's expert, Woodrow Nelson, on cross-examination concerning the standard of care Carrier owed to its employees? Essentially, Carrier complains that the area of inquiry was beyond the scope of the direct examination of Nelson and the testimony should have been excluded.

On direct examination, Nelson testified that the gantry was not unreasonably dangerous; that it was designed for a "sophisticated industrial user"; and that it would be dangerous only in the hands of an untrained person who didn't know how to operate it. Nelson concluded that the accident was caused by a "side load" created by the use of two chain hoists on the gantry, which occurs during the lifting of an object when the gantry is not centered over the load; the lift pulls the object at an angle other than perpendicular, and the load does not hang straight below the I-beam. A side load creates a tendency for the gantry to tip over. Nelson also thought it "incredible" that plaintiff and Richardson, both journeyman pipe fitters, would need warnings against rotating the bases on the gantry when lifting a 3,000-pound load.

During plaintiff's cross-examination of Nelson, the following testimony was elicited, to which Carrier objects: an employee needs more than on-the-job training to use a gantry properly; on-the-job training is an "invitation to an accident"; an employer has the obligation to train and supervise its employees; and Carrier was obligated to train its employees in the use of the rigging pedestal. Carrier argues that this testimony was beyond the scope of H & B's direct examination of Nelson and was an improper attempt by plaintiff to present his theory of the case against Carrier before the jury. Parenthetically, it should be noted that plaintiff did not have a "theory" against Carrier, maintaining his case against H & B only.

Cross-examination which is beyond the scope of the direct exami-

nation of the witness, in which a party attempts to put its theory of a case before the jury, is improper. (*Cuellar v. Hout* (1988), 168 Ill. App. 3d 416, 425, 522 N.E.2d 322, citing *Bryntesen v. Carroll Construction Co.* (1963), 27 Ill. 2d 566, 569, 190 N.E.2d 315.) In the case at bar, Nelson's testimony suggesting the gantry was designed for a "sophisticated industrial user," and that it was dangerous only in the hands of an untrained person, made proper plaintiff's inquiry into on-the-job training and other aspects of instruction regarding gantry use. Carrier's further insistence that the cross-examination constituted impeachment, and thus was not substantive evidence, also must be rejected. Plaintiff's cross-examination of Nelson went far beyond impeachment and was structured to rebut H & B's affirmative defense of assumption of risk.

There is no basis to reverse because of improper and prejudicial cross-examination of Nelson.

## V

Carrier insists that H & B improperly transferred to Carrier its nondelegable duty to warn and instruct on the dangerous nature of the gantry, an error assertedly compounded by the court's having allowed plaintiff to question numerous Carrier employees about the training they received. It concludes that the jury was led to believe that Carrier, rather than H & B, owed plaintiff a duty to make the gantry reasonably safe.

The manufacturer has a nondelegable duty to produce a product which is reasonably safe (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 208, 454 N.E.2d 210), which may include a duty to provide instructions or warnings to the product's user of any "dangerous propensity" about which it knows or should have known. (*Neal v. Whirl Air Flow Corp.* (1976), 43 Ill. App. 3d 266, 272, 356 N.E.2d 1173.) Where a manufacturer is sued under a products liability theory, it may assert a third-party claim for contribution against the injured plaintiff's employer on the basis of negligence. (*J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 516 N.E.2d 260.) Both an unreasonably dangerous product and an employer's negligence thus can contribute to an employee's injury. In the instant case, H & B is not attempting to hold Carrier liable for an unsafe condition of the gantry; rather, *the allegations of Carrier's negligence asserted by H & B arise from an independent duty of reasonable care owed to its employees.* H & B's duty arises from its status as manufacturer; Carrier's duty arises from its status as employer. H & B is not "passing on" its duty to

warn and instruct, but is seeking contribution for Carrier's share of the fault based upon Carrier's negligence.

This independent duty owed Carrier's employees was to provide a safe place to work. Carrier cannot seriously contend that an employer can furnish a sophisticated tool or piece of equipment to an employee and rely solely on the manufacturer to provide all necessary instruction in its use. This obligation is different than and in addition to the manufacturer's duty to produce a product that is reasonably safe. Evidence was also adduced suggesting that Carrier failed to adequately train and supervise its employees in proper rigging techniques where two hoists are employed, or in the use of the rigging pedestal. These deficiencies were unrelated to the allegedly unsafe condition of H & B's gantry. There was no transfer of H & B's nondelegable duty under these circumstances.

■■■ Carrier also contends it was error to allow plaintiff to question various Carrier employees regarding the training they had received, notwithstanding plaintiff's position that such testimony was necessary to rebut H & B's assumption of risk defense. Carrier claims that the testimony of those employees was irrelevant since the issue of plaintiff's assumption of risk is based on his subjective knowledge alone. Although this issue of whether a plaintiff assumed the risk involves a fundamentally subjective test (*King v. American Food Equipment Co.*, 160 Ill. App. 3d 898, 908), it is not based solely on plaintiff's own statements, but includes consideration of his age, experience, knowledge and understanding. *Doran v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981, 989, 360 N.E.2d 440, quoting *Williams v. Brown Manufacturing Co.*, 45 Ill. 2d at 430-31.

The testimony of Carrier employees regarding their training was relevant to demonstrate plaintiff's subjective knowledge and understanding of the risk. Evidence that co-workers have been performing a task in the same manner for a number of years could tend to prove that plaintiff did not appreciate the danger and assume the risk. (See *Doran*, 45 Ill. App. 3d at 991.) There was no error in admitting this evidence.

## VI

■■■ Carrier next asserts that it was improperly restricted by the circuit court in its cross-examination of plaintiff's economic expert, Dr. Charles Linke, who testified that he performed an analysis of plaintiff's lost earnings from the date of the accident to the trial (pretrial loss) and the loss of future earnings assuming plaintiff never

worked again (post-trial loss).

In conducting his analysis, Dr. Linke relied on several factors pertaining to plaintiff: race, sex, age, work-life expectancy, education, occupation, geographical area in which he worked and lived, demonstrated earnings capacity, and actual earnings history. Based on the foregoing, and computing present value, Dr. Linke calculated the pretrial loss to be $265,288 for lost earnings, and $39,793 for lost fringe benefits, the latter consisting of Carrier's contributions of employer-paid health care coverage and pension funds. To calculate post-trial loss, Dr. Linke considered statistics and information pertaining to average earnings of Illinois workers; the growth rate of wages; and plaintiff's life expectancy and earning level. He concluded that the present cash value of plaintiff's lost earnings was $548,893, and post-trial fringe benefit loss was $82,334. Dr. Linke made only one deduction in all his calculations, for unreimbursed employment costs such as union dues and small tools. He estimated these expenses to be approximately 1% of the earnings.

During cross-examination, Carrier attempted to inquire about the effect of other deductions on Dr. Linke's calculations. Plaintiff objected on the grounds that the questions violated a motion *in limine* barring reference to the nontaxability of any award. The court sustained plaintiff's objection and directed Carrier not to question Dr. Linke on the effect of income taxes or social security deductions on the lost earnings calculation; further, the court cautioned Carrier against asking Dr. Linke about the effect of plaintiff's receiving other fringe benefits, such as disability payments, on his analysis.

Carrier subsequently made an offer of proof in which Dr. Linke acknowledged that his estimate of lost earnings would be lower if income tax, FICA, and social security deductions were considered. Dr. Linke would not concede, however, that disability benefits from worker's compensation and social security would lower plaintiff's losses, since he considered such payments to come from preincident earnings. Carrier concedes that it is improper to instruct a jury concerning the nontaxability of any jury award (*Klawonn v. Mitchell* (1985), 105 Ill. 2d 450, 475 N.E.2d 857), but suggests evidence of tax liability is admissible for purposes of proving the amount of earning capacity and damages, relying on *In re Air Crash Disaster Near Chicago* (7th Cir. 1983), 701 F.2d 1189, a case which misanticipated Illinois judicial treatment of this issue, as noted in the following paragraph.

Carrier's argument ignores *McCann v. Lisle-Woodridge Fire Protection District* (1983), 115 Ill. App. 3d 702, 450 N.E.2d 1311, a case directly on point, decided after *In re Air Crash Disaster*. In *McCann*,

defendant to a suit for personal injuries urged that pecuniary loss was a net amount to be determined after a deduction for taxes, and appealed from the circuit court's refusal to allow such evidence. The *McCann* court rejected this contention and concluded that the evidence of the effect of taxes on income loss should be prohibited in a personal injury action. (*McCann*, 115 Ill. App. 3d at 707; see also *Exchange National Bank v. Air Illinois, Inc.* (1988), 167 Ill. App. 3d 1081, 1092, 522 N.E.2d 146.) Here, Carrier was properly prevented from introducing evidence of the effect of income tax on plaintiff's lost earnings.

Carrier also incorrectly insists it was further error to preclude inquiry of Dr. Linke regarding plaintiff's social security or other fringe benefits. (*Brumley v. Federal Barge Lines, Inc.* (1979), 78 Ill. App. 3d 799, 807, 396 N.E.2d 1333; see also *Hopwood v. Thomas Hoist Co.* (1966), 71 Ill. App. 2d 434, 444, 219 N.E.2d 76.) Further, during the offer of proof, Dr. Linke stated that neither social security nor worker's compensation benefits would result in a reduction of lost income from an economic viewpoint, since they were considered preincident earnings. Carrier's argument therefore must be rejected.

Carrier's next assertion of error involving Dr. Linke's testimony is that the circuit court improperly precluded it from inquiring into the use of the growth rate of wages in defining present cash value. The record reveals, however, that Carrier was precluded only from inquiring into reductions of lost earnings for income tax, social security and worker's compensation benefits. Some of the questioning of Dr. Linke elicited by Carrier indeed related to wage growth rates. This line of inquiry was not restricted.

## VII

Carrier also assigns as error certain jury instructions given in this cause. As a preliminary matter, Carrier maintains the circuit court abused its discretion in denying its motion for a bifurcated determination of liability. In essence, Carrier believes that the simultaneous consideration of the distinct theories of negligence, which is "fault based," and products liability, which is "no-fault based," could only lead to confusion on the part of the jury. It concludes that under these circumstances, the circuit court had an obligation to order separate jury determinations.

Carrier refers to the Illinois Pattern Jury Instructions as providing for bifurcated determinations in situations involving a third-party defendant not sued by plaintiff. (Illinois Pattern Jury Instructions, Civil, No. 600.00 (Special Note on Use) (2d ed. Supp. 1986) (IPI Civil

2d).) Carrier's interpretation takes this comment completely out of context. The comment states (IPI Civil 2d No. 600.00 (Supp. 1986), at Supp. 600-02):

"The one principal exception to the usual trial situation (prime action and contribution claim[s] tried jointly) will occur when one or more alleged tortfeasors has settled with the injured person and thereby discharged the liability of some or all of the other alleged tortfeasors."

Such a situation did not exist here. A claim for contribution otherwise must be asserted by counterclaim or third-party claim in the underlying action. (See *Laue v. Leifheit* (1984), 105 Ill. 2d 191, 473 N.E.2d 939.) In this case, where the jury was required to compare the fault of H & B and Carrier, a bifurcated proceeding would defeat the policy reasons behind the Contribution Act (Ill. Rev. Stat. 1985, ch. 70, par. 305; see *Laue*, 105 Ill. 2d at 196-97). Denial of Carrier's motion was not an abuse of discretion under the circumstances.

Carrier next claims that giving certain instructions misled the jury into thinking that both H & B and Carrier owed the same duty to plaintiff. Specifically, Carrier urges that three instructions, IPI Civil 2d No. 600.06 (Supp. 1986), another combining IPI Civil 2d Nos. 600.15 and 600.16, and 600.07 (Supp. 1986) as modified, were improperly given, and operated to transfer H & B's nondelegable duty to Carrier. The instructions reveal no implication that Carrier and H & B owed plaintiff the same duty. There was no error in the substance of the instructions.

Carrier also protests that the circuit court erroneously permitted plaintiff to offer instructions in the third-party action. It cites no authority, however, that suggests such a procedure is improper. As plaintiff points out, he has an interest in insuring the jury is properly instructed, since failure to do so might require a new trial, thereby affecting his verdict. (*Willhite v. Goodman* (1978), 64 Ill. App. 3d 273, 275, 381 N.E.2d 68.) Further, if plaintiff did not offer certain instructions, this court has no way of knowing whether H & B might subsequently have submitted them. In fact, at the instructions conference, H & B did submit duplicates to those of plaintiff in certain instances. There was no error here.

Carrier urges additional error in the court's use of the "long form" of the proximate cause instruction (IPI Civil 2d No. 15.01), which should be used only when there is evidence of a concurring or contributing cause to the injury, other than the acts or omissions of the plaintiff. (IPI Civil 2d No. 15.01, Notes on Use; *Casey v. Baseden* (1986), 111 Ill. 2d 341, 348-49, 490 N.E.2d 4.) Carrier incorrectly in-

terprets this instruction as requiring more than one defendant; issuing this instruction was not error.

The purpose of instructing the jury is to convey the correct principles of law applicable to evidence presented during trial. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1019, 343 N.E.2d 65.) When considering the propriety of instructions, a reviewing court must determine whether those instructions, considered as a whole, were sufficiently clear so as to not mislead the jury. (*Willson v. Pepich* (1983), 119 Ill. App. 3d 552, 558, 456 N.E.2d 882.) It cannot be said that the instructions misled the jury in this case.

## VIII

■■■ Finally, Carrier contends that the verdict against it was contrary to the manifest weight of the evidence and urges this court to reverse. The main thrust of this argument is that Carrier should not be held 80% at fault for the accident in the absence of evidence that it was aware of the unreasonably dangerous nature of the gantry.

A jury's apportionment of damages between joint tortfeasors will not be set aside as contrary to the manifest weight of the evidence unless all reasonable, intelligent minds would reach a different conclusion or unless it is clearly evident that jurors have reached a wrong conclusion or an incorrect result. (*Renfro v. Allied Industrial Equipment Corp.* (1987), 155 Ill. App. 3d 140, 159, 507 N.E.2d 1213, *cert. denied* (1987), 116 Ill. 2d 575; *Bofman v. Material Service Corp.* (1984), 125 Ill. App. 3d 1053, 1060, 466 N.E.2d 1064.) In the instant case, this court finds the jury's apportionment troubling.

As we have noted, ample evidence exists to support the jury's finding that the gantry was unreasonably dangerous and lacked sufficient warnings when it left H & B's control, yet H & B was found only 20% at fault. At trial, however, evidence was adduced suggesting Carrier's negligence included the failure to train its mechanics in the use of a gantry; train the mechanics in rigging techniques, specifically, the use of two hoists on one I-beam; provide the mechanics with a safety instruction film; prevent improper techniques from being passed along between employees during on-the-job training; organize safety meetings; and supervise jobsites to insure safe procedures and proper equipment were being used. The jury reasonably could have accepted any of the above evidence as constituting substantial negligence on the part of Carrier.

Under the circumstances, the jury had the right to believe from the evidence that the gantry's collapse resulted from plaintiff's improper rigging techniques; Carrier's lack of direct training and accept-

ance of on-the-job training in rigging techniques; and Carrier's failure to supervise plaintiff, and that the foregoing resulted in Carrier being 80% at fault. It cannot be said that all reasonable, intelligent minds would reach a different conclusion. Further, Carrier's lack of awareness of the unreasonably dangerous nature of the gantry with its bases rotated would not render such a finding inappropriate. Although this court may not agree with the jury's apportionment, we cannot hold that their determination is clearly contrary to the manifest weight of the evidence. *Kohutko v. Four Columns, Ltd.* (1986), 148 Ill. App. 3d 181, 189, 498 N.E.2d 522.

The preceding discussion discloses no bases upon which to disturb the jury's verdicts in this case and we are, therefore, compelled to affirm.

Affirmed.

SCARIANO and DiVITO, JJ., concur.