**Peter SCHMUTZ, Petitioner,**

v.

**Gene BOLLES, M.D.; Boulder Community Hospital; and Codman & Shurtleff, Inc., Respondents.**

**No. 88SC602.**

Supreme Court of Colorado,
En Banc.

Oct. 29, 1990.

Rehearings Denied Dec. 10, 1990.

Holland & Hart, Brooke Jackson, Marcy G. Glenn, Denver, for petitioner.

Johnson & Mahoney, P.C., Collie E. Norman, Denver, for respondent Gene Bolles, M.D.

Cooper & Kelley, P.C., Paul D. Cooper, Thomas B. Kelley, John R. Mann, Denver, for respondent Boulder Community Hosp.

Hall & Evans, Kathleen G. Lanterman, Thomas N. Alfrey, Denver, for respondent Codman & Shurtleff, Inc.

Justice LOHR delivered the Opinion of the Court.

This case involves medical malpractice and product liability claims arising out of a craniotomy performed to remove a subdural hematoma.[1] During the procedure the plaintiff bled extensively and suffered a stroke. He then filed an action against the surgeon, the hospital and the manufacturer of the drill that was used during the procedure. The jury returned a verdict for the defendants, the trial court entered judgment accordingly, and the Colorado Court of Appeals affirmed that judgment in an unpublished opinion. *Schmutz v. Bolles*, No. 86CA0720 (Colo.App. Oct. 13, 1988). We granted certiorari to determine whether the trial court properly disallowed the use of incident reports kept by the defendant drill manufacturer for any purpose other than notice to the manufacturer and whether the trial court's instruction regarding product misuse was appropriate. We reverse the court of appeals' judgment and return the case with instructions that it be remanded for a new trial.

I.

On February 4, 1983, Dr. Gene Bolles performed a craniotomy at Boulder Community Hospital to remove blood that had accumulated next to Peter Schmutz's brain. A surgical drill, a Smith perforator manufactured by Codman & Shurtleff, Inc. (Codman), was used during the procedure to bore a hole in Schmutz's skull. During the procedure, the drill accidentally plunged[2] through Schmutz's dura, the outer protective membrane covering the brain, and came in contact with his brain. The Cod-

---

1. A craniotomy is any operation on the skeleton of the head. *Dorland's Illustrated Medical Dictionary* 315 (26th ed. 1981). A subdural hematoma is an accumulation of blood below the dura, which is the outermost of three membranes covering the brain. *Id.* at 409, 588.

2. "Plunge" is the term employed by medical experts in describing the continued progress of the drill after passing through the skull.

man drill used in this procedure is designed so that the drill bit will automatically stop rotating when it ceases to encounter firm resistance. This design feature causes the bit to stop turning as soon as it has drilled through the skull and before it perforates the dura. During the Schmutz operation, however, the drill apparently did not stop turning, and instead it plunged through the dura and came into contact with his brain. The effect of this accidental plunging was disputed at trial. A neurosurgeon called by Schmutz as an expert witness expressed the opinion that the drill bit went into Schmutz's brain and that branches of an artery wrapped around the bit and were torn off at a location away from the bit, causing extensive bleeding. Dr. Bolles testified that the drill merely bruised the brain and did not penetrate it. Defense experts expressed opinions that the drill plunge could not have caused the extensive bleeding at the location where it was encountered. They testified that the bleeding was probably caused by the spontaneous rupture of a pre-existing vascular malformation in Schmutz's brain or the removal of the hematoma itself. Whatever its cause, the unexpected bleeding that occurred during the procedure resulted in a stroke that left Schmutz partially paralyzed and with diminished vision.[3]

Schmutz filed an action in Boulder County District Court against Dr. Bolles, Boulder Community Hospital and Codman. Schmutz sued Bolles for negligence in the use of the Smith perforator during the operation. He sought relief against the hospital for negligence in failing to clean the Smith perforator properly. He asserted claims against Codman based on negligence and strict liability theories. Schmutz averred that Codman negligently manufactured or designed the Smith perforator or the warnings or instructions related to it, and that the instrument was defective and unreasonably dangerous. Schmutz also sought exemplary damages against Codman.[4] At trial, all of the defendants contended that the drill malfunction did not cause the bleeding in Schmutz's brain. Codman also argued that the drill malfunction was caused by the hospital's inadequate cleaning of the drill.

At the conclusion of the trial, the jury returned a verdict for all of the defendants, and the trial court entered judgment accordingly. The court of appeals affirmed. Schmutz now argues that the trial court erred in limiting the use of Codman's reports of other drill malfunction incidents to the issue of notice to Codman.[5] If the reports were to be admitted to prove causation, all of the defendants would be affected.[6] Codman would be further affected by admission of the reports to show that the drill was defective. Schmutz also contends that the trial court erred in giving a product misuse instruction to the jury. This allegation of error involves Schmutz's product liability claim against Codman only.

3. Peter Schmutz was twenty years old at the time of the surgery. He had a history of epileptic seizures. The subdural hematoma that necessitated surgery by Dr. Bolles apparently resulted when Schmutz struck his head in a fall during such a seizure.

4. Initially, Schmutz's claims against the three defendants were more extensive. The description in the text is taken from jury instruction no. 1, outlining the claims and defenses of the parties as they were presented to the jury.

5. Codman moved in limine for exclusion of the reports of other drill malfunction incidents. This motion was discussed at a pretrial conference but not ruled on definitively before trial. During trial the admissibility of the reports was the subject of several discussions among the court and counsel. Although in these discussions the trial court elaborated on the various purposes for which notice would be relevant,

and on one occasion distinguished the purposes for which incident reports received prior to the sale of the Smith perforator, those received after that time but prior to the Schmutz surgery, and those received after the Schmutz surgery would be relevant, the court's limiting instructions to the jury stated simply that the incident reports were to be considered for notice to Codman only and not for the truth of their contents.

6. Dr. Bolles and Boulder Community Hospital contend that the incident reports were not offered against them at trial. The record reveals that the reports were formally offered generally and without limitation. Moreover, Schmutz's written response to Codman's motion in limine regarding the reports makes clear his intention to have the reports admitted to provide causation.

We will address Schmutz's contentions in turn.

## II.

### A.

During discovery, Schmutz obtained from Codman approximately two hundred reports concerning malfunctions of the same model drill that occurred between 1977 and 1986.[7] Each incident report consists of one or more documents, including a "Codman Product Complaint Report," and often including a "Patient Related Incident Report," internal Codman memoranda and correspondence. The Product Complaint Report and Patient Related Incident Report are both printed Codman forms. A Codman representative fills out the form based on information provided by a doctor, hospital employee or Codman field representative who has spoken with hospital personnel. The attached memoranda often include reports by Codman investigators who, after examining a returned drill, express an opinion about the cause of the malfunction. In many cases, the reports attribute the malfunction to the hospital's failure to assemble or clean the drill properly.

Schmutz sought admission of these reports, contending that they were relevant for at least three purposes: (1) to demonstrate that Codman had notice of the malfunctions of the drill and of the potential misuse of the drill by failing to clean, lubricate and assemble it properly between uses; (2) to support Schmutz's theory of causation; and (3) to show that the drill was a defective product. The trial court admitted all but one of the reports, but only for the purpose of demonstrating notice.[8] The court rejected the use of the reports for the other proffered purposes,

concluding that for such uses the reports were inadmissible hearsay. The trial court excluded one report completely, concluding that the risk of prejudice resulting from its admission would outweigh any value it might have in establishing notice. *See* CRE 403.

### B.

■ Evidence is hearsay if it is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). The incident reports were not hearsay when used to establish notice because they were not admitted to establish the truth of the statements in the reports. The trial court, therefore, correctly admitted the reports to show that Codman knew of the reported malfunctions and the improper cleaning and assembly to which Codman had attributed those malfunctions.

■ Use of the reports to establish causation or product defect, however, would entail admitting the reports as evidence of the truth of the statements contained in them. The trial court excluded the reports for all purposes other than notice to Codman, noting that they typically contained information from persons other than those who wrote the reports and therefore were hearsay.

■ Hearsay is inadmissible unless it falls within a statutory exception or one of the exceptions found in rule 803 of the Colorado Rules of Evidence. Schmutz argues that these incident reports should have been admitted under the business records exception of CRE 803(6) or under the residual exception of CRE 803(24). We conclude that the incident reports may be admissible as business records under CRE

---

**7.** Codman produced the reports of incidents that occurred prior to the Schmutz surgery before the case went to trial. The reports of later incidents were produced by Codman based on a trial court order issued during presentation of the plaintiff's case.

**8.** In addition to the relevance of notice for the purposes of Schmutz's negligence and product liability claims against Codman, the trial court

determined that it was relevant to plaintiff's punitive damages claim against Codman. In discussions with counsel the court often described the limited purposes for which the evidence was received as notice and punitive damages. It made no specific mention of the punitive damages purpose to the jury, apparently on the basis that this was simply a specific application of the general purpose of notice.

803(6) and that the reports must be considered individually to determine whether they qualify for admission under that rule.

CRE 803(6) provides in pertinent part: The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(6) A memorandum report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.[9]

Underlying the business records exception is the belief that records kept in the ordinary course of business and relied upon by a business necessarily have sufficient guarantees of trustworthiness. *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 200 (Colo. 1984) (applying common law predecessor to CRE 803(6)).

■ There are five requirements for a business record to be admissible under CRE 803(6): (1) the document must have been made "at or near" the time of the matters recorded in it; (2) the document must have been prepared by, or from information transmitted by, a person "with knowledge" of the matters recorded; (3) the person or persons who prepared the document must have done so as part of a "regularly conducted business activity"; (4) it must have been the "regular practice" of that business activity to make such doc-

uments; and (5) the document must have been retained and kept "in the course of" that, or some other, "regularly conducted business activity." *White Indus. v. Cessna Aircraft Co.*, 611 F.Supp. 1049, 1059 (W.D.Mo.1985) (applying Fed.R.Evid. 803(6)); *see also Downing v. Overhead Door Corp.*, 707 P.2d 1027, 1030–31 (Colo. App.1985) (applying CRE 803(6)).[10] In addition, a court must be satisfied that the source of the information or the method or circumstances of preparation do not indicate lack of trustworthiness. CRE 803(6).

The first requirement is that the entries must have been made at or near the time the incident occurred. This can be determined by reference to the incident reports themselves. Our review of the record reveals that in most cases the incidents were reported to Codman on the same day they occurred or a few days thereafter. The reports were generally made out by a Codman employee *during the conversation in which the incident was reported*. An examination of each report should have been conducted to determine whether the entries were made soon enough after the surgery to satisfy the prompt entry requirement.

■ The second requirement for admissibility of business records is that the information contained in the records must have been transmitted by a person with knowledge of the event reported. This does not mean that the number of persons creating the records must be limited to two: a person with first-hand knowledge of the incident and the person writing the report. The chain must begin with an individual who has actual knowledge, but the information may be transmitted through a number of individuals as long as each is transmitting the information in the ordinary course of business. *United States v. Bak-*

---

9. The federal rule is identical. Fed.R.Evid. 803(6).

10. Prior to adoption of CRE 803(6), business records were admissible if the following five requirements were met: (1) the record must have been made in the regular course of business, (2) those participating in making the record must have been acting in the routine of business, (3) the input procedures must have

been accurate, (4) the entries must have been made within a reasonable time after the occurrence, and (5) the information must have been transmitted by a reliable person with knowledge of the event reported. *Palmer*, 684 P.2d at 201 (applying common law predecessor to CRE 803(6)). We consider these requirements to be substantially similar to those now embodied in CRE 803(6).

*er*, 693 F.2d 183, 188 (D.C.Cir.1982); *see United States v. Keplinger*, 776 F.2d 678, 694 (7th Cir.1985), *cert. denied*, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); *see also* E. Cleary, *McCormick on Evidence* § 310 (1984). A number of the incident reports kept by Codman meet this requirement. Some of the incidents were reported by the neurosurgeon who had used the drill that allegedly malfunctioned. These reports would clearly satisfy this requirement. Other reports were made by the operating room supervisor or a nurse.[11] In those instances in which a hospital representative who had not witnessed the malfunction reported the incident to Codman, the trial court should have examined the reports individually to determine if the information originated with an individual who possessed first-hand knowledge of the incident and was transmitted to others who were delegated to report the incident to Codman in the ordinary course of business. In some cases, the nature of the information itself may indicate that it was supplied by someone with personal knowledge. *Keplinger*, 776 F.2d at 694; *United States v. McGrath*, 613 F.2d 361, 368 (2d Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980).

The third requirement for admission as a business record is that those participating in making the record must have done so as part of a regularly conducted business activity. Typically, business records are produced by individuals working for the same organization. One employee might gather

information and pass it on to another employee who would write the report. Those reports contain double-hearsay, but they are nonetheless admissible under the business records exception. As the United States Court of Appeals for the District of Columbia Circuit has written,

> [d]ouble hearsay exists when a business record is prepared by one employee from information supplied by another employee. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6).

*Baker*, 693 F.2d at 188; *accord Grogg v. Missouri Pac. R.R. Co.*, 841 F.2d 210, 213–14 (8th Cir.1988).

This case is made more difficult because the chain of persons transmitting the information found in the incident reports includes doctors and hospital personnel as well as Codman employees. Doctors or nurses who were present when the drill malfunctioned either contacted a Codman agent directly or informed another hospital employee who in turn contacted a Codman agent. The Codman representative then either filled out the incident report forms or conveyed the information to another Codman employee who filled out the forms.[12]

Statements by an outside party included within a business record have not been accorded the presumption of accuracy that attaches to statements made in the regular

---

**11.** Donald Lincoln, Director of Domestic Regulatory Affairs at Codman, estimated that in ninety-five percent of the cases, someone who had not been in the operating room reported the incident to Codman. Our own review of the 201 incident reports contained in the exhibits indicates that, approximately, fourteen percent of the reports contain information provided by the surgeon who used the drill, sixteen percent contain information reported by nurses, ten percent contain information reported by operating room supervisors, and nineteen percent contain information provided by other hospital personnel. Forty-six percent of the reports do not specify the original source of the information. Some of the reports contain information from more than one of the above sources, thereby resulting in the double counting that causes the

above percentages to total one hundred and five percent.

**12.** The incident reports often include other memoranda produced solely by Codman employees, such as service department reports documenting the condition of the returned drill. These memoranda were produced by Codman employees as part of their jobs and clearly meet the requirements of the business records exception. *See Keplinger*, 776 F.2d at 694. At issue on appeal, however, are statements that are either recorded on the incident report form or contained in correspondence appended to the form, concerning a drill malfunction during surgery and the result of that malfunction. Because each such statement concerns what happened in the operating room, its source is necessarily someone other than a Codman employee.

course of business because the outside party does not have a business duty to report the information. *Baker*, 693 F.2d at 188. Accordingly, such statements by an outside party have generally been denied admission. *Id.* For example, third-party statements included in an official report prepared by a police officer have been held inadmissible. *E.g., United States v. Snyder*, 787 F.2d 1429, 1434 (10th Cir.), *cert. denied*, 479 U.S. 836, 107 S.Ct. 134, 93 L.Ed.2d 78 (1986); *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983). Likewise, statements of a patient that are included in a hospital's report have been denied admission. *Cook v. Hoppin*, 783 F.2d 684, 690 (7th Cir.1986); *Petrocelli v. Gallison*, 679 F.2d 286, 289–90 (1st Cir. 1982).[13] When information is provided as part of a business relationship between a business and outsiders, however, records containing the information have been considered admissible. *See, e.g., Keplinger*, 776 F.2d at 694; *United States v. Flom*, 558 F.2d 1179, 1182–83 (5th Cir.1977); *White Indus.*, 611 F.Supp. at 1060–62. One or more of the following features are usually present in cases holding such records admissible: (1) the business had standardized forms to be filled out by outsiders; (2) outsiders provided information at the business' request; or (3) the document was of a type regularly relied upon by the business in making decisions. *See United States v. Mendel*, 746 F.2d 155, 166 (2d Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *Matter of Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir.1981). The business' reliance on the information in the records is a particularly important factor. *See Keplinger*, 776 F.2d at 694 (letters created by one business but regularly received, maintained and relied upon by another are admissible as business records of the latter

business under Fed.R.Evid. 803(6)); *Flom*, 558 F.2d at 1182 (invoices prepared and sent by one company but kept on file by another company in the regular course of business are admissible); *Downing*, 707 P.2d at 1030–31 (admitting insurance adjuster's report containing information provided by employee of independent distributor and service outlet for defendant garage door manufacturer's products).

In this case, the incident reports were kept on file by Codman for business purposes. Codman employees asked doctors or hospital representatives questions about reported incidents in order to complete the standardized Codman forms. Codman then relied on those reports in processing product repair and replacement requests and in making product design decisions.[14]

The fourth and fifth requirements are that it must have been the "regular practice" of the business to make such documents, and the documents must have been retained and kept in the course of a regularly conducted business activity. Both of these requirements are clearly met in this case. The incident reports consist of printed Codman forms completed in the ordinary course of business.[15] The record indicates that Codman had been receiving and keeping complaints about the drill at least since 1968.

Finally, a court must be satisfied that the source of the information or the method or circumstances of preparation do not indicate lack of trustworthiness. In applying this standard, the court should consider each of the proffered incident reports individually.

We conclude that the trial court erred in refusing to admit any of the incident reports for purposes other than establishing notice without considering them individual-

---

13. Statements made by outside parties and included in a business record have been received in evidence, however, when someone within the business verified the information in the regular course of business while the record was being prepared. *United States v. Zapata*, 871 F.2d 616, 625 (7th Cir.1989) (hotel guest registration records—business practice was that hotel clerk verified information by reference to guest's business card or driver's license).

14. The record suggests that as a result of the reported malfunctions and Codman's determination that improper cleaning and assembly were the causes of those malfunctions, Codman considered developing a special cleaning tray and a disposable perforator.

15. The company began using the standardized incident report form in 1980.

ly.[16] On remand, the trial court should make an individualized assessment of each incident report to determine whether it complies with the requirements of CRE 803(6) as enunciated above.

### C.

■ The defendants contend that any error in limiting the purpose for which the jury could consider the reports was harmless for several reasons. First, the defendants assert that all but one of the incident reports were available to the jury. The jury, however, was instructed to consider the incident reports only on the issue of notice, and we must assume that the jury followed those instructions. *E.g., People v. Smith*, 620 P.2d 232, 239 (Colo.1980); *James v. James*, 85 Colo. 154, 165, 274 P. 816, 820 (1929). Furthermore, the limitation of the purpose of the reports to showing notice prevented the plaintiff from fully utilizing the reports in cross-examining the defendant's expert witnesses or in arguing to the jury concerning causation and defect.

■ Second, the defendants contend that the reports would have been merely cumulative on the issues of causation and defect. They argue that because the incident reports formed part of the basis of the testimony of plaintiff's expert witnesses Dr. Richard Saunders and Dr. Igor Paul concerning causation and defect, the reports themselves need not be admitted. This argument ignores the persuasive impact of numerous reports documenting other "plunges," some of which resulted in brain injuries. The specific accounts of malfunctions contained in the incident reports go beyond the very limited summary of those incidents found in the expert testimony. Furthermore, the defendants argued and the trial court agreed that Report No. 1714,[17] which vaguely described an incident in which a drill went into brain tissue and "wound around,"[18] was sufficiently prejudicial to be excluded under CRE 403[19] even for the non-hearsay purpose of establishing notice.

■ The defendants also contend that the incidents are so dissimilar from the facts of the current case as to be irrelevant to the issue of causation. To be relevant, evidence need only have a tendency to make the existence of a fact of consequence to the determination of the action more or less probable. CRE 401. A number of the reports document drill malfunctions resulting in injury when the drill plunged through the dura and came in contact with the patient's brain. These incidents have a tendency to support Schmutz's theory that the drill plunge caused more than mere bruising. Report No. 1714, in particular, documents a winding around within the brain. On remand the trial court must make an individualized assessment of each report to determine whether it meets the threshold requirement of relevance as to each defendant. We are not convinced that all of the reports can be dismissed as irrelevant to causation.

16. Because we hold that the incident reports may be admitted as business records under CRE 803(6), we do not address the plaintiff's contention that they are also admissible under the residual hearsay exception contained in CRE 803(24). On retrial the court may consider whether, in general, an incident report that does not qualify for admission under CRE 803(6) can be considered for admission under CRE 803(24) and, if so, may also consider the applicability of CRE 803(24) in evaluating whether each proffered incident report is admissible.

17. The defendants argue that exclusion of Report No. 1714 was harmless because it was read to the jury by witness Donald Lincoln, Codman's Director of Domestic Regulatory Affairs. Although Lincoln read portions of the report to the jury, the jury was instructed to consider the incident reports only on the issue of notice and the report was not included among the exhibits that were available to the jury during deliberations.

18. The report includes the statement:

> Only one hole & did not release. Went to dura. Into brain tissue & it wound around. Caused some bleeding.

19. CRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

## III.

Next, we consider whether the trial court erred in submitting an instruction on the defense of misuse [20] to the jury.[21]

One of Codman's defenses at trial was that the drill malfunction was caused by the hospital's failure to clean and maintain the drill properly. Testimony at trial established that in order to clean the Smith perforator properly, the six-piece assembly should be taken apart, cleaned and autoclaved.[22] If the perforator is not taken apart and cleaned before autoclaving, the fluid and debris that accumulate in the crevices between the various pieces is baked on during the autoclaving, forming a layer of material that can prevent the drill from disengaging properly. There was evidence that as a result of a policy change at Boulder Community Hospital and ensuing misunderstandings concerning assignment of responsibility for cleaning the drills, the drill used for Schmutz's operation had not been cleaned properly. Codman requested and received jury instructions on the defense of product misuse.

█ Colorado has adopted the doctrine of strict liability as found in the *Restatement (Second) of Torts* § 402A. *Jackson v. Harsco Corp.*, 673 P.2d 363, 365 (Colo. 1983). Misuse is a defense to a product liability action under this doctrine, but only if the misuse is unforeseeable by the manufacturer. *Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1325 (Colo.1986); *Jackson*, 673 P.2d at 367; *Restatement (Second) of Torts* § 402A, comments h, j.

█ A defendant who could reasonably foresee the possibility of misuse is not entitled to an instruction on the misuse defense. *Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1297 (10th Cir.1989); *Steinmetz v. Bradbury Co., Inc.*, 618 F.2d 21, 23 (8th Cir.1980). An instruction on the misuse defense should be given only if there is evidence that the defendant could not foresee the possibility of misuse. *Farrell*, 866 F.2d at 1297; *Walker v. Trico Manufacturing Co., Inc.*, 487 F.2d 595, 598–99 (7th Cir.1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *Porter v. United Steel & Wire Co.*, 436 F.Supp. 1376, 1381–82 (N.D.Iowa 1977); *Thomas v. American Cystoscope Makers Inc.*, 414 F.Supp. 255, 262 (E.D.Pa.1976); *Suich v. H & B Printing Machinery, Inc.*, 185 Ill. App.3d 863, 133 Ill.Dec. 768, 541 N.E.2d 1206, 1212–13, *appeal denied*, 128 Ill.2d 672, 139 Ill.Dec. 522, 548 N.E.2d 1078 (1989); *see also Converse v. Zinke*, 635 P.2d 882, 889 (Colo.1981). "There must be more than a mere scintilla of evidence to support an instruction. Sufficient competent evidence is required." *Farrell*, 866 F.2d at 1297; *see also Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 518 (Colo.1986).

█ In this case there was no competent evidence that the hospital's failure to clean the drill properly was unforeseeable. Codman conceded that improperly cleaned drills could fail to disengage. Codman also conceded knowledge that some hospitals improperly cleaned their drills. The record contains overwhelming and uncontroverted evidence that the hospital's failure to clean the drill properly was foreseeable.[23] Our review of the record reveals that more than thirty of the prior incident reports admitted into evidence contained documents produced by Codman attributing the drill malfunction to improper cleaning, and accumulated blood, rust and debris.

**20.** Instruction No. 24 stated:

> A manufacturer of a product is not legally responsible for injuries and damages caused by a product if:
> 1. The product is used in a manner or for a purpose other than that which was intended and which could not reasonably have been expected by the manufacturer; and
> 2. Such use rather than a defect, if any, in the product caused the plaintiff's claimed injuries and damages.

**21.** Although Codman contends that Schmutz did not object to the misuse instruction at trial on the basis that there was no evidence to support it, the record does not support that contention.

**22.** Autoclaving is a sterilization procedure employing pressurized steam. *Dorland's Medical Dictionary* 140 (26th ed. 1981).

**23.** Testimony revealed that Codman officials have long known that hospitals sometimes do not assemble and clean the drills properly.

The trial court gave a product misuse instruction because a defense witness testified that Boulder Community Hospital's chronic repeated failure to clean the drill properly for a period of more than a month, as contrasted with occasional failure to clean, was not foreseeable. Dr. Eagar, an expert witness called by Codman, testified that although a drill could malfunction the first time it was used after it had been cleaned improperly, if it is improperly cleaned repeatedly it surely will malfunction eventually. Because a single instance of improper cleaning could cause the drill to malfunction and numerous instances of improper cleaning in various hospitals were known to Codman, the uncontroverted evidence was that the product misuse was foreseeable. There was no evidence to support the product misuse instruction. Therefore, the trial court erred in submitting it to the jury.

### IV.

In sum, we hold that the incident reports should be individually evaluated under the standards enunciated in this opinion for admission under CRE 803(6), the business records exception to the hearsay rule. We also hold that the trial court erred in submitting the product misuse instruction to the jury. Accordingly, we reverse the court of appeals' judgment and return the case to the court of appeals with instructions to remand the case for a new trial.[24]

ROVIRA, C.J., and VOLLACK, J., do not participate.

---

24. Codman cross-appealed, asserting that the trial court erred in receiving the incident reports for any purpose because Codman admitted notice prior to the Schmutz surgery on February 4, 1983, that the Smith perforator could fail in the manner claimed by the plaintiff and because the matters described in the incident reports were not substantially similar to the failure of the Smith perforator during the Schmutz surgery. Codman also asserted that the post-surgery incident reports were inadmissible on the issue of punitive damages. The court of appeals found it unnecessary to consider the cross-appeal in view of its affirmance of the judgment of the trial court. Because in the course of a new trial the trial court must consider each incident report individually, and the evidentiary context may be different from that of the first trial, we do not consider it necessary that the court of appeals address these issues before remanding the case for retrial. We also note that the trial court did not instruct the jury that punitive damages was a purpose for which the incident reports could be considered. *See* n. 8, above.